Russell **BECKWITH**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 18752.

United States Court of Appeals
Fifth Circuit.

Aug. 9, 1961.

Walter T. Norman, Jr., Gassaway, Allen & Norman, Borger, Tex., for appellant.

W. B. West, III, U. S. Atty., William L. Hughes, Jr., Asst. U. S. Atty., Fort Worth, Tex., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and JONES, Circuit Judges.

JONES, Circuit Judge.

This action was brought by the United States under the provisions of 31 U.S.C.A. § 231, charging the appellant, Russell Beckwith, with making and presenting, or causing to be made and presented, two false claims to the Veterans Administration for the purpose of inducing that agency to grant loan guaranties and pay cash gratuities in connection with the purchase of homes by veterans.

The District Court for the Northern District of Texas, Amarillo Division, sitting without a jury, awarded the Government a forfeiture of $2,000 on each of the two false claims and double damages in the amount of $320 on each claim. On appeal, Beckwith asserts that, as to one of the Government's claims, there was a material variance between its pleading and its proof. He also asserts that, as to both claims, there was no proof of the damage alleged.

The appellant was engaged in the construction and marketing of dwellings in and in the neighborhood of Borger, Texas. He made a contract, on March 24, 1953, for the sale to Raymond Wesson for $7,150, of a house in Borger. Wesson was eligible for veterans' credit assistance under the Servicemen's Readjustment Act of 1944, 38 U.S.C.A. § 1801 et seq., under which the Government guarantees loans made to veterans for purchasing homes and pays a cash gratuity to the lender for the credit of the veteran-borrower. The veteran, to obtain the benefit of the Act for himself and his lender, must intend to purchase the dwelling for his home.

At the time of executing the purchase agreement, Wesson signed an application for a Veterans Administration Home Loan Guaranty with respect to the financing of the purchase of the dwelling property. Wesson, called as a witness for the Government, testified that he called Beckwith "later on and I told him I did not want the house, if there was any way he could fix it up where I didn't have to buy it." He quoted Beckwith as saying, "He [Beckwith] could do it." He was asked approximately how long after he had made his application did he tell Beckwith he did not want the house. He replied, "I would say within a month." On cross-examination Wesson became confused and was led into saying it might have been two months after he contracted for the house before he told Beckwith he did not want it. But, he said, "it wasn't too long after." The deed from Beckwith to Wesson and a mortgage deed of trust from Wesson to Ricks-Maguire Company were dated May 15, 1953, and filed for record on May 25, 1953. The latter date may be taken as the date the funds were disbursed by the lender. Application for the Veterans Administration Loan Guaranty was made two days later. An error in the application required that an amended application be submitted. This was done on June 26, 1953. The applications for the guaranty of the Wesson loan are the basis for the first of the alleged false claims of Beckwith against the United States.

The other asserted false claim involves the Veteran, James C. Preas. There was evidence showing that Beckwith, prior to May 23, 1953, had negotiated with Preas for the sale of the same dwelling that was the subject of the Wesson transaction. On May 23, 1953, Preas made application for water and sewer service and for gas and electric service. On May 28, 1953, he signed a contract for the purchase from Beckwith for $7,850 of a house in Fritch, Texas, which is about fourteen miles west of Borger. Preas thought he was buying the Borger property and it ultimately developed that he was right. He moved into the Borger property about the time he made the application. The Fritch property was conveyed by Beckwith to Preas who gave a mortgage deed of trust to Ricks-Maguire Company. These documents were executed early in July of 1953. Later Preas conveyed the Fritch

property to a nominee of Beckwith. Wesson deeded the Borger property to Beckwith, who conveyed it to Preas. Preas signed a number of documents and could remember reading none of them. He wasn't, he said "much of a reader." But, he testified, "I know this much, that I wanted to buy a house in Borger and, as far as I know, I did buy one but I never did know I bought a house out at Fritch." The application for the Veterans Administration guaranty of the loan to Preas on the Fritch property constituted the second of the two alleged false claims. There is no contention made that there was error in the imposition of the penalty with respect to this claim.

The contention is made that unless Wesson had abandoned his intention to occupy the Borger property, and had communicated his change of mind to Beckwith before the closing of the transaction, no false claim was made. For this proposition the appellant cites United States v. DeWitt, 5 Cir., 1959, 265 F.2d 393, certiorari denied 361 U.S. 866, 80 S.Ct. 121, 4 L.Ed.2d 105. The closing, says the appellant, was on, or at least no later than, May 25, 1953, the date of the disbursement by the lender, and not on May 27, 1953, and June 26, 1953, the dates of the application and amended application for the loan guarantee, which were the dates alleged in the complaint as the dates of the making of the false claim. We have some difficulty in determining the question which the appellant would have us decide. The specification of error says that "The court erred in awarding a * * * forfeiture with respect to the Wesson claim in that the loan was closed on May 25, 1953, whereas the Government charged material dates of May 27, 1953, and June 26, 1953." This seems to suggest that there is a fatal variance between allegation and proof. The appellant misreads the complaint. It charges that the false claims were made on the two designated dates. It is not alleged in the complaint that either of these dates specifies the time when Wesson formed or communicated to Beckwith the intention not to occupy the dwelling he

had agreed to buy. But if the complaint were as the appellant reads it, or rather misreads it, there would be no error. We are looking at a complaint under the Federal Rules of Civil Procedure, not at a declaration under the common law. The objection of a variance is not a favored one under prevailing rules of procedure and, unless prejudice is shown any error would be harmless. Bordonaro Bros. Theatres v. Paramount Pictures, 2 Cir., 1949, 176 F.2d 594; Montgomery v. Moreland, 9 Cir., 1953, 205 F.2d 865. Even if we were to test the pleading, which seeks a forfeiture, by the more strict rules of criminal pleading, we would still find that no error had been committed. Unless time is of the essence of the offense, the time need not be proved as laid in the indictment. Hardy v. United States, 186 U.S. 224, 22 S.Ct. 889, 46 L.Ed. 1137; 5 Wharton's Crim.Law and Proc., Anderson's Ed., 210 § 2062.

We will assume that the appellant is correct in his position that if the Government is to recover it must prove that the veteran must have abandoned his intent to occupy and the seller must have learned of that intent before the delivery of the deed and mortgage and the disbursements. The appellant insists that the DeWitt case so holds. The Government asserts that there has been no closing until the Veterans Administration has issued its certificate guaranteeing the loan. We do not find it necessary to decide this narrow question. If Wesson made his statement to Beckwith that he did not want the house within a month from the time of his application, as Wesson said on direct examination, then the time would have been not later than April 24th. If, as Wesson said on cross-examination the elapsed time could have been as much as two months, then the date would have been May 24th, the day before the loan disbursing took place. We have no doubt but that the evidence shows knowledge by Beckwith prior to May 25th of Wesson's changed intention. Wesson testified that "I told him [Beckwith] that I did not want the house if there was any way he could fix it up where I didn't have

to buy it." This shows that when Wesson talked to Beckwith, he had not yet bought the house, and this would not have been so after the papers had been executed and delivered and the loan disbursed. Beckwith had put Preas in possession of the property on or before May 23, 1953, prior to the closing of the Wesson transaction. We have no difficulty in affirming the judgment which implicitly finds that the appellant made or caused to be made an application for the guaranty of the loan to Wesson with knowledge, at the time the loan was made and disbursed, that Wesson did not intend to occupy the property as his home.

To the appellant's assertion that the Government failed to show that it incurred any monetary losses in either the Wesson or the Preas loan claims, and was, therefore, not entitled to double the amount of damages sustained, or $320 for each claim, the Government replies that the evidence submitted was sufficient for the district court to draw the conclusion that a cash gratuity of $160 in each of the two false claims had been paid by the Government to the lender for the credit of the veteran-borrower. That evidence consisted of the testimony of the Chief of the Loan Processing Section of the Veterans Administration who stated that his office processed, prepared and forwarded to the finance office the public vouchers for the disbursement of a $160 gratuity in each of the transactions with Wesson and with Preas. The Government also introduced as evidence documents from the files of the Veterans Administration which included a Loan Progress Sheet for Wesson and another for Preas which indicates that a public voucher for $160 was issued in each of the two claims. Also included in the documents are the vouchers for $160 each. It is our belief that the evidence is sufficient to sustain the district court's determination that the Government incurred damages of $160 with respect to each of the two transactions. We find it difficult to understand why the Government relied upon the circumstantial evidence of payment of the gratuities when direct and positive evidence was, apparently, readily available. However the finding is not clearly erroneous. United States v. Kaplan, 5 Cir., 1960, 277 F.2d 405; Kwong v. Occidental Life Insurance Co., 5 Cir., 1959, 273 F.2d 691.

The judgment of the district court is Affirmed.